UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


HECTOR JENKINS,
        Plaintiff,



        v.                                          CIVIL ACTION NO. 16-11548-PBS



HOUSING COURT DEPARTMENT,
CITY OF BOSTON DIVISION, A SECTION OF THE
TRIAL COURT OF THE
COMMONWEALTH OF MASSACHUSETTS,
        Defendant.



REPORT AND RECOMMENDATION ON
DEFENDANT TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS'
MOTION FOR SUMMARY JUDGMENT (#117).

KELLEY, U.S.M.J.

I. Introduction.

A single claim of race-based retaliatory termination in violation of Title VII[1] remains in

this case. (#66.) From 1993 through 2016, Hector Jenkins was employed as a mediator in the

Housing Specialist Department of the Boston Housing Court. (#54 ¶ 6.) He alleges that on June

17, 2016, he wrote a letter to the Deputy Housing Court Administrator "outlining his charges of

racial discrimination in employment and the ongoing failure of the Boston Housing Court to

---

[1] As Chief Judge Saris wrote in a previous order concerning a motion to dismiss, Mr. Jenkins' claim is "that
he was summarily terminated approximately one month after complaining in writing to [Deputy Court
Administrator] Burke about 'racial discrimination in employment,' among other things. Racial
discrimination in employment is precisely what Title VII was designed to prohibit. Jenkins has now alleged
a plausible, exhausted claim of wrongful [retaliatory] termination." (#66 at 11 (internal citation omitted).)

1

address serious issues of equal access for litigants of all races." (#54 ¶ 55.) In early July 2016, the Deputy Housing Court Administrator recommended that Mr. Jenkins be terminated from employment, a recommendation that was approved later that month by the Chief Justice of the Trial Court, the Chief Administrator of the Trial Court, and the Chief Justice of the Housing Court Department. (#54 ¶¶ 56, 57.) Plaintiff claims he was wrongfully terminated for sending the June 17th letter complaining about racial discrimination.

Defendant Trial Court of the Commonwealth of Massachusetts (Trial Court) has filed a motion for summary judgment, which plaintiff opposes. (##117, 123.) The dispositive motion has been fully briefed (##118, 119, 124, 125) and stands ready for decision.

## II. The Facts.

The following facts are undisputed unless otherwise noted.[2] From May 1993 until July 2016, plaintiff was employed by the Trial Court as a Housing Specialist. (#119 ¶ 1; #124 ¶ 1.) In the spring of 2015, plaintiff's immediate supervisor was Michael Neville, Chief Housing Court Specialist. (#119 ¶ 2; #124 ¶ 2.)  Judge Jeffrey Winik was the First Justice of the Boston Housing Court; Judge Steven Pierce was the Chief Justice of the Housing Court[3]; Judge Paula Carey was the Chief Justice of the Trial Court; and Paul Burke was the Deputy Court Administrator. *Id*.

---

[2] Plaintiff has submitted a Statement of Additional Uncontested Material Facts. (#124 at 29-35.) Defendant requests that the Court strike or ignore the proposed facts because they are not material, and the paragraphs do not comply with Local Rule 56.1. (#125.) It is true that certain paragraphs are not supported by citations to admissible evidence. It is also true that many of the paragraphs appear to relate to claims that have been dismissed, i.e., hostile work environment and failure to promote, and therefore are not material. Plaintiff primarily relies on his own deposition testimony (#124 ¶¶ 5-13, 15-24) or emails (#124 ¶ 6) as support for his facts. The deposition testimony and emails were submitted by defendant as exhibits (#119, Exh. 19, 20) and will be considered. In any event, the gist of most of plaintiff's proposed facts is that he had a history of sending emails to numerous Trial Court employees complaining about various issues and he had a confrontational relationship with Mr. Neville. These proposed facts are undisputed.

[3] Judge Pierce was later replaced by Judge Timothy Sullivan. (#119 ¶ 2; #124 ¶ 2.)

In March and April of 2015, plaintiff sent numerous lengthy emails to his co-workers, court administrators, and judges accusing Judge Winik, Judge Pierce and the court administration of "criminal collusion" and "criminal harassment." (#119 ¶ 3, Exh. 2-8; #124 ¶ 3.)[4] These missives centered on plaintiff's complaints surrounding the appointment of Mr. Neville to the position of Chief Housing Court Specialist a decade earlier in 2005, with Mr. Jenkins "accus[ing] the current administration of collusion in [Neville's] hiring, in a rigged process, and discriminating by fixing the process to hire a white applicant with allegedly an [sic] high school education . . . over an African American, qualified attorney, and that [sic] was already performing the job of assistant Chief Specialist." (#119 ¶ 3, Exh. 3.) Plaintiff wrote that "the collusion involves the First Justice and the current Chief Justice." *Id.* In one email, he "accused the current Administration with Criminal Collusion in filling the Chief's Position and Criminal Harassment as a result of bringing the issue up to the Chief Justice of the Housing Court." (#119 ¶ 3, Exh. 4.)[5] Mr. Jenkins also objected to the fact that judges, especially Judge Winik, "dictate[d] agreements for judgement from the bench," a practice which plaintiff viewed as improper. (#119 ¶ 3, Exh. 2 at 3.)

On April 29, 2015, Christine Hegarty, Esq., Manager, Human Resources of the Trial Court, advised Mr. Burke by email "that based on the latest series of emails sent by Mr. Jenkins, we are placing Mr. Jenkins on paid administrative leave immediately and arranging for an independent medical exam to determine his fitness for duty." (#119 ¶ 4, Exh. 9.) By letter on the same date, Mark T. Conlon, Esq., Director of Human Resources of the Trial Court, confirmed to Mr. Jenkins that he had been placed on administrative leave "pending an independent medical evaluation to

---

[4] While plaintiff admits that the emails speak for themselves, he consistently denies the Trial Court's statements of fact because defendant characterizes plaintiff's emails as "inappropriate."

[5] This seven-page email was sent to Mr. Jenkins' co-workers, Judge Winick, Mr. Burke, two union representatives, and the manager of Human Resources for the Trial Court. (#119 ¶ 3, Exh. 4.)

determine [his] fitness for duty pursuant to Section 13.07(j) of the collective bargaining agreement with Local 6." (#119 ¶ 4, Exh. 10.) Mr. Conlon further instructed plaintiff that while on administrative leave, he was "not to contact, either by phone or email, any Trial Court staff, or enter any courthouse without prior permission." *Id.*

Dr. Russell Vasile, Diplomate, American Board of Psychiatry and Neurology, conducted an independent medical evaluation of Mr. Jenkins on May 8, 2015. (#119 ¶ 5, Exh. 11; #124 ¶ 5.) In his report dated May 20, 2015, Dr. Vasile cleared Mr. Jenkins to return to work, finding plaintiff was no risk of harm to himself or others, and that there was no evidence of current depression or psychiatric disorder. (#119 ¶ 5, Exh. 12; #124 ¶ 5.) Mr. Conlon forwarded a copy of Dr. Vasile's report to Mr. Jenkins on June 3, 2015, and further advised plaintiff that he would have to attend a meeting prior to returning to work to "review the events that led to the fitness for duty evaluation" and the Trial Court's expectations for him. (#119 ¶ 6, Exh. 13; #124 ¶ 6.)

On June 12, 2015, while he was on paid administrative leave, Mr. Jenkins visited the offices of the Supreme Judicial Court in the John Adams Courthouse in Boston without receiving prior permission as directed by Mr. Conlon's April 29, 2015 letter. (#119 ¶ 7, Exh. 14; #124 ¶ 7.)[6] This conduct was later found to be "insubordinate" by Mr. Neville. *Id.*

On July 1, 2015, in advance of his return to work on July 7, 2015, plaintiff attended a meeting with Judge Winik, Mr. Burke, Mr. Neville, Dick Russell, Business Agent of OPEIU, Local 6, and Eamonn G. Gill, Labor Counsel with Human Resources. (#119 ¶ 8, Exh. 16; #124 ¶ 8.) Mr. Jenkins was provided a copy of a memo detailing Housing Specialists' Duties and Responsibilities, previously sent by email to all Housing Specialists. (#119 ¶ 8, Exh. 15; #124 ¶ 8.) Among the listed duties and responsibilities were the requirements that Housing Specialists "[c]ommunicate

---

[6] Mr. Jenkins denies that he needed permission to enter the courthouse. (#124 ¶ 7.)

4

Case 1:16-cv-11548-PBS Document 127 Filed 12/09/19 Page 5 of 26

in a professional manner with all employees, managers, judges, clerk and [the] public" and that requests for vacation and personal time off were to be submitted in writing and approved in advance. *Id*.

In a letter dated July 2nd, to Mr. Jenkins, summarizing the meeting on July 1st, Mr. Gill wrote as follows:

> We discussed the avenues you have thus far chosen to air your complaints regarding your supervisors. It was explained that you can file a complaint with your supervisor or, if the complaint is about your supervisor, your supervisor's supervisor. If neither of these avenues is sufficient, you can speak to your union representative. In any event, repeated letters and/or emails airing the same complaints to multiple parties, to include the Chief Justice of the Supreme Judicial Court and/or the Chief Justice of the Trial Court, are neither professional nor appropriate. Although not discussed during the meeting, complaints may also be filed with me, as a representative of the Trial Court, and I will forward to appropriate parties. You were warned that failure to comply with the above and attached directives could result in your discipline up to and including termination.

> When provided with these directives, specifically the Housing Specialist duties and responsibilities, you indicated that you disagreed with some of the contents therein. It was explained to you that the expectation was that you would comply with these directives, but you were free to grieve any of these requirements through your union. Failure to comply could be a basis of discipline.

> Finally, based upon your unprofessional attitude and conduct at our meeting on July 1st, 2015, which included talking loudly, talking over individuals who were speaking, and demanding that the meeting adhere to your agenda, you were warned that insubordinate conduct such as this upon your return to work could also result in your discipline up to and including termination. Further, while it is understood that you have levied accusations against both Judge Winik and Mr. Neville, and you have the right to do so, the appropriate forum was and is not during a work meeting focusing on your return to work. This is a topic that will no longer be entertained during working hours, unless scheduled by the Trial Court. Your unwillingness or inability to follow this directive may also result in your discipline up to and including termination.

(#119 ¶ 9, Exh. 16.)

Four days later on July 6, 2016, Mr. Jenkins wrote a seventeen-page letter to Mr. Gill[7] entitled "Collusion by Boston Housing Court Judges among other violations, abuse of power an accessory after the fact by Administrative Office of the Massachusetts Court, unfair labor conditions, violations of my Civil Rights, and request for immediate relief." (#119 ¶ 10, Exh. 17.) The letter included a litany of charges and accusations, including the "collusion" of Judge Winik, the "dereliction" of Judge Pierce, the two judges' alleged "lack of integrity, partiality and unfairness," Mr. Gill's "obstruction of justice," and so on. *Id.* Mr. Gill acknowledged receipt of plaintiff's letter and notified Mr. Jenkins "that the Trial Court will be exploring [his] claims" and that he could "expect a substantive response to the issues." (#119 ¶ 11, Exh. 18.)

On the day after returning to work, July 8, 2015, plaintiff sent four emails to Mr. Neville, cc'd to Judge Winik, apparently making a record of what he perceived as continued harassment. (#119 ¶ 13, Exh. 19.) Mr. Jenkins referred to Mr. Neville and Judge Winik as "corrupted officials," noting that he had accused both of corruption. *Id.* When asked at his deposition if he considered charging Mr. Neville and Judge Winik with being corrupt in an email was insubordinate, plaintiff responded "[t]hey were corrupt, it's a fact." (#119 ¶ 13, Exh. 20.) Mr. Jenkins also opined that, given the circumstances, sending the email was "professional." *Id.* On July 10, 2105, plaintiff emailed Mr. Neville regarding the Housing Specialists' Duties and Responsibilities, commenting on three of the rules. (#119 ¶ 14, Exh. 21.) By letter dated July 14, 2015, Mr. Neville addressed Mr. Jenkins' behavior, writing:

> You returned to work on July 7, 2015. Despite what was discussed at the meeting on July 1, 2015, on July 8 and July 10, as memorialized in Labor Counsel Gill's July 2, 2015 letter, you have continued to send emails to me and First Justice Jeffrey

---

[7] This letter was cc'd to the United States Attorney Office Criminal and Civil Rights Division, the Massachusetts Attorney General Division of Public Integrity, the Massachusetts Senate Joint Committee on the Judiciary, Honorable Ralph D. Gants, Honorable Paula Carey, Judge Pierce, Judge Winik, Michael Neville, and Richard Martin/Russell. (#119 ¶ 10, Exh. 17.)

Winik, all with a similar tone and content to the previous emails. I find this behavior to be insubordinate.

This is a written warning issued in accordance with Section 16:00 of the Trial Court's Personnel Policies and Procedures Manual and will be placed in your personnel file. You may submit to me a single response to this warning in writing which will be placed in your personnel file.

You have been warned repeatedly that is constant disrespectful behavior is unacceptable and inappropriate. I was to reiterate to you the expectations for appropriate behavior outlines in Labor Counsel Gill's letter of July 2, 2015, and remind you that any continuation of this behavior will result in discipline up to and including termination of employment.

(#119 ¶ 15, Exh. 14.)

On August 14, 2015, Mr. Gill assigned Antoinette Rodney-Celestine, Human Resources Attorney, to investigate Mr. Jenkins' complaints. (#119 ¶ 17, Exh. 22.) As parsed by Ms. Rodney-Celestine, plaintiff's claims were "(1) 'rigged' hiring of Chief Housing Specialist Michael Neville, (2) Chief Housing Specialist Michael Neville's 'mistreatment' of his employees, including Mr. Jenkins,[8] (3) the process in which agreements are handled by the Judges sitting at the Boston Housing Court and (4) what Mr. Jenkins alleges as a refusal to provide him with a reason as to why he was placed on administrative leave on April 29, 2015." *Id*. Ms. Rodney-Celestine contacted Mr. Jenkins on September 1, 2015, to advise him she was investigating his complaints, and then met with him on September 9, 2015, to discuss the particulars of his claims. (#119 ¶ 18, Exh. 22, 23.) On December 3, 2015, after receiving multiple emails from Mr. Jenkins, Ms. Rodney-Celestine requested that he stop emailing and allow her focus on his claims in order to complete the investigation. (#119 ¶ 19, Exh. 25.)

---

[8] In the second amended complaint, Mr. Jenkins alleges that Mr. Neville told him that "we don't want you here" and "you can complain to your boy Obama if [you] want." (#54 ¶ 26.) Mr. Jenkins viewed these statements as a "racially-motivated attack." *Id*. ¶ 27. There is no indication in the findings of the investigator that Mr. Jenkins ever told her that Mr. Neville's "mistreatment" of him or others included race-based attacks. (#119, Exh. 24.)

7

On December 4, 2015, Mr. Neville issued a second written warning to Mr. Jenkins. (#119 ¶ 20, Exh. 26.) In relevant part, the warning letter stated:

On or about November 6, 2015, I provided you with a contact information form ("form") to be completed and returned to me. By November 20, 2015, I had not received your completed form. I provided you with another copy of the form and requested that you return it to me by November 23, 2015. When you did not comply with this subsequent directive, I sent you an email, on November 24, 2015, detailing my numerous requests for return of your form. Furthermore, I gave you until November 25, 2015, to return the form to me. Again, you did not comply with my directive. On November 27, 2015, I provided you with a hard copy of my email. On that date, your provided me with an incomplete form. You left the address field blank. I then approached you and said that the form was incomplete and you told me that I did not need that information.

*Id.*[9] Mr. Neville concluded that plaintiff's conduct constituted "insubordination and failure to comply with a reasonable order." *Id.* Mr. Jenkins was once again admonished that further misconduct could result in disciplinary action. *Id.*

On December 9, 2015, plaintiff sent an email to Judge Winik, cc'd to Mr. Burke and Mr. Neville, and then forwarded to Chief Justice Sullivan, questioning the authority and responsibilities of the Chief Housing Specialist. (#119 ¶ 21, Exh. 27.) Judge Winik replied the same day, stating:

Michael Neville is the Chief Housing Specialist for the Boston Division of the Housing Court. As such he is authorized to manage the Housing Specialist Department and he has supervisory responsibility over all the Housing Specialists assigned to the Boston Division. As an employee you are required to comply with all reasonable work-related orders you receive from your supervisor, Mr. Neville. I remind you that under the provisions of the Trial Court Personnel Policies and Procedure Manual . . . "insubordination or a demonstrated lack of respect for persons in authority" is conduct that would warrant disciplinary action.

*Id.* Mr. Jenkins responded by sending a six-page email to Judge Winik on December 9th, cc'd to Chief Justice Sullivan, Mr. Neville, Mr. Burke and Mr. Conlon, suggesting, inter alia, that Mr. Gill

---

[9] Plaintiff denies that he failed to complete the form. (#124 ¶ 20.) However, in an email, he claimed he "had the right to only provide [Neville] with my wife's name and number" and he "declined to put [his] home address and [his] cell phone number" on the form. (#195, Exh. 35.)

had "engaged in clear obstruction of the truth," that Mr. Conlon and Mr. Gill were "accessories to the abuse," and that Mr. Conlon and Judge Winick had "coordinated abuse of power." *Id.*

On December 9, 2015, Ms. Rodney-Celestine emailed Mr. Jenkins:

At our meeting on September 9, 2015, I requested that you refrain from contacting the newly appointed Chief Justice of the Boston Housing Court, Timothy Sullivan, while my investigation is pending. Most recently, on December 3, 2015, I requested that you refrain from sending any further emails, concerning your claims, while this investigation is pending because they were diverting my attention away from investigating your claims. Despite these requests you have sent an abundance of emails since December 3, 2015, to myself, Mr. Neville, Judge Winik, Chief Justice Paula Carey and Court Administrator Harry Spence. The substance of these emails all involve the same complaints you have repeatedly raised. Furthermore, on or about July 2, 2015, you received a letter from Labor Counsel Eamonn Gill informing you that "repeated letters and/or emails airing the same complaints to multiple parties, to include the Chief Justice of the Supreme Judicial Court and/or the Chief Justice of the Trial Court, are neither professional nor appropriate." You were further advised of the different avenues for filing a complaint. You were also warned that your failure to comply with the directives set forth in Mr. Gill's letter "could result in your discipline up to and including termination." Another copy of this letter is attached for your review.

Consider this email a directive to you to cease and desist from sending or re-sending **any** further emails and/or any other written or verbal communication to **any** Trial Court employee concerning any of the claims raised by you, while this investigation is pending. You are expected to fully comply with this directive. Any violation of this directive may subject you to disciplinary action.

(#119 ¶ 23, Exh. 28.) Plaintiff emailed Ms. Rodney-Celestine the following day insisting that she recuse herself from the investigation of his complaints due to her "seeming conflict of interest" as well as her being "tone-deaf to [his] request." (#119 ¶ 24, Exh. 29.) At his deposition, Mr. Jenkins testified that he had received Ms. Rodney-Celestine's December 9, 2015 email, but reiterated that she had a conflict of interest because she had been appointed by Mr. Gill and that she was "one of the corrupt officials." (#119 ¶ 25, Exh. 20.) As plaintiff saw it, he was entitled to disregard her directive and to ask Chief Justice Sullivan to investigate his complaints. *Id*.

9

Case 1:16-cv-11548-PBS Document 127 Filed 12/09/19 Page 10 of 26

From mid-December 2015 through February 2016, Mr. Jenkins authored numerous emails to Chief Justice Sullivan, Judge Carey, Mr. Burke, Harry Spence (Court Administrator), Mr. Conlon, and Ms. Hegarty, all of which violated Mr. Gill and Ms. Rodney-Celestine's directives to cease and desist sending such emails. (#119 ¶ 26, Exh. 30-36.) For example, in a February 3, 2016 email, plaintiff reiterated his "complaints of malfeasance by [his] managers at the Boston Housing Court" and Mr. Conlon's "abuse." (#119 ¶ 28, Exh. 33.) Two days later he sent a ten-page email to Messrs. Burke, Conlon, Neville, Ms. Hegarty and his union representatives listing his complaints as "collusion, rigged hiring, abuse of power, abuse of public funds, and willful negligence to address malfeasance of managers." (#119 ¶ 29, Exh. 35.) Plaintiff again raised the "collusion" between Judge Winik, Mr. Neville and others that resulted in a "rigged and unfair hiring process," accusing Mr. Conlon and Mr. Gill of being "accessories after the fact" in part because Mr. Conlon ordered him to undergo a fitness for duty examination; Ms. Rodney-Celestine's "apparent wilful intent to undermine an investigation," and Mr. Gill's "wilful obstruction of justice." *Id.* Mr. Jenkins forwarded his February 5th email to Chief Justice Sullivan, who in turn emailed Ms. Rodney-Celestine, inquiring "Is there anything that can be done to address Mr. Jenkins' defiance of the earlier directive not to contact me directly?" (#119 ¶ 30, Exh. 36.)

Ms. Rodney-Celestine emailed Mr. Jenkins on March 8, 2016, requesting that he meet with her and Trial Counsel Elizabeth Day the following day to review the findings of her investigation. (#119 ¶ 32, Exh. 37.) Plaintiff responded in short order with a four-page email, cc'd to Mr. Spence, continuing his diatribe concerning his claims of collusion in filling the Chief Housing Specialist position in 2005, the administrative conflicts of interest and malfeasance by managers, etc., and ending with the statement, "after my experience with the hierarchy thus far, and based on our

10

record, your words and actions, I do not trust you and find no nedd [sic] to meet with you again. Again, issue your findings or ask the questions on the records." (#119 ¶ 33, Exh. 38.)

On March 10, 2016, Ms. Rodney-Celestine emailed Mr. Jenkins, acknowledged his March 8, 2016 email and then stated:

> You were previously directed to cease and desist from sending or re-sending **any** further emails and/or any other written or verbal communication to **any** Trial Court employee concerning any of the claims raised by you, while the investigation was pending. You were expected to fully comply with this directive and you were informed that any violation of this directive may subject you to disciplinary action. You continued your communication with Trial Court employees during the pendency of my investigation. Your communication, today, to Court Administrator Harry Spence was a continuing violation of this directive. Take note, that I am once again reiterating this directive to you.

(#119 ¶ 34, Exh. 39 (emphasis in original).) Plaintiff was ordered to meet with Ms. Rodney-Celestine and Ms. Day on March 14, 2019. *Id.* Mr. Jenkins replied with a multi-page email asking what legal right Ms. Rodney-Celestine had to require a meeting, and that he had "the right to refuse to meet with corrupt offcials (sic) unless required by law, the contract, or [his] regular duties." (#119 ¶ 35, Exh. 40.) Ms. Rodney-Celestine responded that management was mandating that he attend the meeting, and that failing to appear could result in disciplinary action. (#119 ¶ 36, Exh. 40.) On Saturday, March 12, 2016, plaintiff emailed back stating he "should [not] be forced again to sit and talk to corrupt mid-level officials[,]" and requested continuance so he could seek legal advice and assistance from his state senator. (#119 ¶ 37, Exh. 40.)

On Monday, March 14, 2016 at 7:35 AM, Mr. Jenkins emailed Ms. Rodney-Celestine, cc'd to Chief Justice Carey,[10] repeating at length his view of the alleged obstruction and abuse by Messrs. Conlon and Gill, as well as the impropriety of her appointment as investigator, and then

---

[10] Mr. Jenkins understood that cc'ing Chief Justice Carey contravened Ms. Rodney-Celestine's directive not to send emails to court personnel, but he believed he "had a right to ask Paula Carey relief from meeting with these corrupt officials." (#119 ¶ 40, Exh. 20 at 282-83.)

11

advising for the first time that he could not attend the meeting that day "due to a previous doctor's appointment."[11] (#119 ¶ 38, Exh. 41.)  Plaintiff did not attend the March 14th meeting with Ms. Rodney-Celestine and Ms. Day. (#119 ¶ 41, Exh. 42.)

On the morning of March 14th, Mr. Jenkins left a telephone message for Mr. Neville, stating he had a 9:00 a.m. appointment; Mr. Neville assumed that appointment was the one scheduled with Ms. Rodney-Celestine, but then learned plaintiff did not attend that meeting. (#119 ¶ 42, Exh. 42.[12]) Later the same day, Mr. Jenkins left a second telephone message for Mr. Neville, explaining that his medical procedure had been completed, he was taking the day as a personal day, and he was taking the following day, March 15, 2016, as a vacation day. (#119 ¶ 43, Exh. 42.) Mr. Neville returned plaintiff's call, denied the request for a vacation day, and ordered him to report to work the next day. *Id.*

On March 15, 2016, Mr. Jenkins attended the scheduled morning meeting with Ms. Rodney-Celestine and Ms. Day. Ms. Rodney-Celestine presented plaintiff with the findings from her investigation. (#119 ¶ 44, Exh. 24, 44.)[13] The parties differ on what transpired during the

---

[11] At his deposition, Mr. Jenkins testified that he did not recall telling Ms. Rodney-Celestine earlier about his medical appointment, but in any event he did not owe "her an explanation [because] [s]he was just a corrupt official appointed by Judge Carey" and she did not "deserve any explanation." (#119 ¶ 39, Exh. 20 at 281-82.)

[12] Mr. Jenkins denies this statement of fact and exhibit. (#124 ¶ 42.) However, in his own email dated March 15, 2016, plaintiff confirmed much of the substance of the statement of fact and exhibit: he called Mr. Neville on March 14, 2016, to say that he was taking the day as a personal day, he requested March 15, 2016 as a vacation day, and Mr. Neville thereafter returned the call, denied the vacation day and ordered him to work.  (#119, Exh. 45.)

[13] Ms. Rodney-Celestine's findings included the following: with respect to Complaint #1, the alleged 2004/2005 illegal and rigged process of hiring Mr. Neville, the "investigator found no evidence of an 'illegal hiring' and/or 'rigged' hiring process"; Complaint #2, mistreatment by Mr. Neville, the investigator found evidence that Mr. Neville had said to plaintiff at least once that he 'was not acting right'" and that there was evidence "of a couple of 'shouting matches'" between plaintiff and Mr. Neville in the open office area; Complaint #3, alleged improper process BHC judges use in handling cases, the investigator found plaintiff "ha[d] expressed [his] dissatisfaction with the work of the court, on numerous occasions, through inappropriate channels" despite having been directed to present issues to his supervisor so that issues could

meeting. Ms. Day stated that Mr. Jenkins was disruptive and kept interrupting Ms. Rodney-Celestine. (#119 ¶ 44, Exh. 44.) According to Ms. Day:

> Mr. Jenkins said he would not review the findings with us. He indicated that maybe he would review them later and get in touch by e-mail. Attorney Celestine was firm in her response that the matter was now considered closed, her findings were not open to debate, and that if Mr. Jenkins did not want her to go over the findings, he could read them later and seek any outside redress of his choosing, but he was not to have contact with any member of the Trial Court regarding the same complaints or the investigation.

*Id.* Plaintiff denies this account of events. (#124 ¶ 44.)

On March 15, 2016, Mr. Jenkins sent an email to Chief Justice Sullivan, later forwarded to Judge Winik, entitled "Complaint of persecution and discriminatory practise [sic]" in which he challenged Mr. Neville's denial of his vacation day request, claiming it was "unprecedented, was not based on operational needs, was a denial of [his] right in a legal and fiduciary sense since it represents currency earned - and this denial of access was based on a whimsical, retaliatory and discriminatory pursuit." (#119 ¶ 45, Exh. 45.)

Mr. Jenkins also emailed Ms. Rodney-Celestine on March 15th relating his version of the meeting that had taken place that day. (#119 ¶ 46, Exh. 46.) He thanked Ms. Rodney-Celestine for allowing him to record the meeting. *Id.* According to Ms. Day's recollection of the meeting, Ms. Rodney-Celestine had told plaintiff "she had not allowed him to record the meeting and that it was illegal for him to have done so." (#119 ¶ 45, Exh. 44.)

---

be addressed through the appropriate channels; and Complaint #4, no explanation for why plaintiff was placed on administrative leave, the investigator stated that a question of his mental health was raised as a result of the volume of emails he sent to Trial Court staff, the "frequent, repetitive, confusing and often rambling" nature of those emails, and plaintiff's apparent inability to stop sending "these repetitive emails" despite being told to cease and desist." (#119, Exh. 24.)

By letter dated March 16, 2015, Ms. Rodney-Celestine acknowledged Mr. Jenkins' March 15th email containing what she viewed as misstatements of facts. (#119 ¶ 47, Exh. 43.) [14] Ms. Rodney-Celestine explicitly told plaintiff:

> To clarify, you were instructed yesterday that you are to cease and desist from all communication with Trial Court employees concerning the claims you raised in your complaint. Your complaint was investigated, findings were issued and the matter is now closed. This directive includes any member of the Judiciary including the Supreme Judicial Court. As I stated in our meeting yesterday, you have the right to initiate litigation if your so choose but you may not communicate with any member of the Judiciary concerning the claims you raised in your complaint. Therefore, once again, you are being instructed to cease and desist from sending or re-sending **any** further emails and/or any other written or verbal communication to any employee of the Judiciary concerning the claims raised in your complaint.

*Id.*

On March 17, 2016, Mr. Jenkins was placed on administrative leave effective immediately pending a disciplinary hearing prompted by his alleged "course of misconduct" up to, and including, his conduct during the March 15th meeting. (#119 ¶ 48, Exh. 47.) Plaintiff was instructed that while on leave, he was not to communicate with Trial Court employees or enter any Trial Court facilities. *Id*. He was advised that he would receive a disciplinary hearing notice detailing the charges against him. *Id*.

On June 10, 2016, plaintiff was notified by Mr. Burke that a disciplinary hearing would be held on June 21, 2016, at which time he would have to answer six charges:

Charge #1:  Insubordination and failure to comply with a reasonable order
Charge #2:  Inability or unwillingness to work cooperatively with others
Charge #3:  Violation of or failure to comply with the Federal or State Constitution, statutes, or court rules and regulations and conduct unbecoming
Charge #4:  Improper use of Trial Court property, equipment or funds
Charge #5:  Unauthorized absence from work
Charge #6:  Misstatement of fact with regard to a request for sick leave and other leaves or abuse of such leaves

---

[14] Mr. Jenkins denies this statement of fact, asserting that his memory of the details of the meeting differs from those of Ms. Rodney-Celestine and Ms. Day. (#124 ¶ 47.)

(#119 ¶ 49, Exh. 48.) Mr. Jenkins responded by email on June 16, 2016, with an attached letter dated June 17, 2016, to Mr. Burke, cc'd to Chief Justice Carey, and then forwarded to Ms. Rodney-Celestine and Mr. Spence. (#119 ¶ 49, Exh. 49.)[15]

The subject of the June 17, 2016 letter was "Preliminary Formal Administrative Charges Against Chief Justice of the Massachusetts Trial Courts Paula Carey, and against Massachusetts Trial Courts Administrator Harry Spence, to the Chief Justice And Full Members of the Massachusetts Supreme Judicial Court, under Massachusetts Trial Courts Personnel Manual I and Procedures 16.000 Rules and Discipline 16.500 Discipline or Removal of Management Employees and 16.000 Exceptions to Disciplinary Policy for All Employees, due to the Violations of the aforementioned generally and specifically, and for being 'characters' unbecoming an Officer of the Courts, due to consistent and blatant 'conducts', to prevent equal access to justice." (#119 ¶ 49, Exh. 49.) Mr. Jenkins requested that Mr. Burke forward his letter to Chief Justice Gants and the other members of the SJC for emergency action. *Id.* Plaintiff sought removal of Chief Justice Carey and Mr. Pence for ignoring his prior complaints of collusion, rigged hiring process, discrimination based on race, retaliation, violations of the Trial Court Personnel Rules and Regulations, allegedly supporting malfeasance by employees and managers of the Trial Courts, ignoring Haitian-Creole speaking users of the Housing Court, and denying equal justice/housing under the law. *Id.* Mr. Jenkins protested the 2005 hiring of Mr. Neville as well as the alleged lack of integrity in the investigation of his complaints. *Id.* He requested "immediate and emergency relief." *Id.* Between June 17 and 18, 2016, plaintiff sent at least five emails to Ms. Rodney-Celestine and Chief Justice Carey. (#119 ¶ 51, Exh. 50-54.)

---

[15] At his deposition, plaintiff testified that this letter to Mr. Burke is the one referenced in paragraph 55 of the Amended Complaint. (#119 ¶ 51, Exh. 20.) According to Mr. Jenkins, he was terminated in retaliation for having sent this letter.

15

On June 21, 2016, Mr. Burke presided over plaintiff's disciplinary hearing. (#119 ¶ 54, Exh. 55.) The attendees included Mr. Jenkins, Richard Russell, Business Agent, Local 6, Mr. Neville, Ms. Day, Ms. Rodney-Celestine, and two members of the Security Department. *Id.* Evidence was presented on the charges brought against plaintiff, and Mr. Burke concluded, "It is clear from Mr. Jenkins' own statements, his behavior, management's witnesses and documents that Mr. Jenkins has engaged in all the misconduct as outlined in the June 10, 2016 notice." *Id.* At the conclusion of the hearing, Mr. Burke:

> asked [Mr. Jenkins] if there was any way he could put all these issues behind him and return to work as a productive member of the staff. His immediate answer was an emphatic no. Upon reflection, however, he did state that he would be willing to return upon the resignation of all senior Trial Court management who have not responded to his complaints in a manner that he deems satisfactory.

*Id.* On the evening of June 21st, Mr. Jenkins sent an email to Mr. Burke and Chief Justice Carey stating that what he wanted was a "[f]air settlement [and] resignation by the shown to be corrupt[.]" (#119 ¶ 57, Exh. 56.)

Chief Justice Carey contacted Mr. Conlon on June 23, 2019, to complain about the "barrage of emails" she was receiving every day from Mr. Jenkins. (#119 ¶ 58, Exh. 57.) Mr. Conlon responded that although plaintiff had been told on multiple occasions to cease sending such emails, he refused to follow directives. *Id.*

On July 7, 2016, Mr. Burke issued his findings with regard to Mr. Jenkins' disciplinary hearing:

> I find that Mr. Jenkins cannot return to work as a productive member of the staff. He is unwilling to accept any reasonable direction or instruction from any member of management who does not sympathize with his fixation. He would continue to be a disruptive force amongst the staff. He has received multiple written warnings over the past year and been placed on administrative leave twice due to his abusive nature with no indication of complying with acceptable behavior. Therefore, my recommendation is that he be terminated from employment in the Trial Court at the earliest possible time.

16

(#119 ¶ 54, Exh. 55.) On July 21, 2016, Chief Justice Sullivan adopted Mr. Burke's findings and recommendation and issued a letter terminating Mr. Jenkins' employment with the Trial Court effective July 22, 2016. (#119 ¶ 60, Exh. 1.)

### III. Standard of Review.

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). To prevail on a motion for summary judgment, the moving party bears the initial burden of averring the absence of a genuine issue of material fact "and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party asserts the absence of a genuine issue of material fact, the nonmovant must demonstrate the existence of a factual dispute with requisite sufficiency to proceed to trial. *Murray v. Kindred Nursing Centers W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991). "[I]mprobable inferences, conclusory allegations, or rank speculation" cannot alone defeat summary judgment. *Ingram v. Brink's, Inc.*, 414 F.3d 222, 229 (1st Cir. 2005); *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 40 (1st Cir. 2011) (internal citation and quotation marks omitted) ("conclusory allegation is not sufficient for purposes of establishing a significant, not trivial, harm").

In determining whether summary judgment is proper, courts view the record in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the nonmovant's favor. *Caraballo-Caraballo v. Corr. Admin*, 892 F.3d 53, 56 (1st Cir. 2018) (citations

17

omitted). Upon a party's motion, Rule 56 requires the entry of summary judgment when the nonmoving party fails to establish the existence of any one essential element on which he will bear the final burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal citations and quotation marks omitted); *Murray*, 789 F.3d at 25.

## IV. Discussion.

It is unlawful under Title VII "for employers to retaliate against persons who complain about unlawfully discriminatory employment practices." *Ahern v. Shinseki*, 629 F.3d 49, 55 (1st Cir. 2010) (internal citations and quotation marks omitted). "Title VII retaliation claims proceed under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015); *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014) ("Retaliatory termination claims based on circumstantial evidence are evaluated using the *McDonnell Douglas* burden-shifting framework."). Plaintiff must first "establish[] a *prima facie* case of . . . discrimination." *McDonnell Douglas,* 411 U.S. at 802. "[T]he prima facie case requires only a small showing, one that is easily made." *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018) (internal citations and quotation marks omitted). The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action taken. *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 88 (1st Cir. 2018) (citations omitted); *Adamson v. Walgreens Co.*, 750 F.3d 73, 78 (1st Cir. 2014). Once the employer's burden of production is met, "[t]he presumption [of discrimination], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor*

18

*Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (citation omitted). The burden shifts back to the plaintiff to prove "by a preponderance [of evidence], that the [employer's] explanation is a pretext for unlawful discrimination." *Rivera-Rivera*, 898 F.3d at 88 (quoting *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 221 (1st Cir. 2007)); *Adamson*, 750 F.3d at 78-79. Under First Circuit law,

> [a]t the summary judgment stage, the plaintiff must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was ... discrimination. At this stage, it is insufficient for a plaintiff merely to undermine the veracity of the employer's proffered justification. Instead, []he must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination.

*Tyree v. Foxx*, 835 F.3d 35, 41 (1st Cir. 2016) (internal citations and quotation marks omitted); *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 (1st Cir. 2015).

Turning to the claim at hand, "[i]n order to establish a prima facie case of retaliation, [plaintiff] must show that (1) []he engaged in protected conduct; (2) []he was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct." *Rivera-Rivera*, 898 F.3d 94 (citation omitted); *Planadeball*, 793 F.3d at 175. Mr. Jenkins has established the first two factors: It is uncontested that he wrote a letter to a court administrator complaining about racial discrimination and he was terminated from his job. Defendant argues that plaintiff stumbles on the third step because he cannot show a causal connection between his writing the letter and his termination.

The Supreme Court has held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation. . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, (2013); *Roy v. Correct Care Sols.,*

19

*LLC*, 914 F.3d 52, 70–71 (1st Cir. 2019) (citations omitted) ("The causation element of a Title VII retaliation claim is not satisfied by evidence that retaliation was one motivating factor in the adverse action. Instead, [plaintiff] must show 'but-for' causation -- that is, that []he 'would not have [been terminated] in the absence of the' protected complaints."); *Abril-Rivera v. Johnson*, 806 F.3d 599, 608 (1st Cir. 2015).

Defendant contends Mr. Jenkins has proffered no direct evidence on this causal link. For example, no deposition testimony, answer to interrogatory, or admission has been submitted to establish that Mr. Burke ever read the June 17, 2016 letter attached to the June 16, 2016 email plaintiff sent to him. Even if it can be inferred in plaintiff's favor that Mr. Burke read the letter, there is a dearth of evidence that Chief Justice Sullivan, the ultimate decisionmaker, did. "Temporal proximity can create an inference of causation in the proper case. But to draw such an inference, there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action." *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006) (internal citations omitted); *Posada v. ACP Facility Servs., Inc.*, 389 F. Supp.3d 149, 158 (D. Mass. 2019). Neither the email nor the letter was directly sent, cc'd, or forwarded to Chief Justice Sullivan. In short, there is nothing in the record to show that the person who ultimately terminated plaintiff's employment was aware that Mr. Jenkins drafted and sent the June 17, 2016 letter complaining about racial discrimination, which is the protected conduct alleged. Plaintiff advances no contrary argument with respect to Chief Justice Sullivan. (*See* #123.)[16]

_____

[16] In his Supplemental Memorandum (#123), plaintiff blurs the line between his long history of complaints and the protected conduct alleged to have been the but-for cause of his dismissal. Mr. Jenkins notes the "complaint in writing to Burke about 'racial discrimination in employment'" and his "termination about one month after he sent that June 17, 2016 letter." (#123 at 2.) Plaintiff also states that his "long history of complaints . . . and the Trial Court's lack of response and improper responses to them evidence the fact of the retaliation." *Id.* at 4. Mr. Jenkins argues that the Trial Court did not terminate him earlier despite his

Mr. Jenkins contends that his June 23, 2016 termination coming on the heels of his June 17, 2016 letter establishes the necessary causation. Temporal proximity can give rise to an inference of causation. *See Planadeball*, 793 F.3d at 177; *Soni v. Wespiser*, No. CV 16-10630-TSH, 2019 WL 3891515, at *5 (D. Mass. Aug. 19, 2019). Even assuming, arguendo, that the facts supported both Mr. Burke and Chief Justice Sullivan having knowledge of the June 17, 2016 letter, the temporal proximity between that letter and plaintiff's termination is insufficient to show a causal connection in this case. "Chronological proximity does not by itself establish causality, particularly if [t]he larger picture undercuts any claim of causation." *Ponte*, 741 F.3d at 322 (internal citations, quotation marks and alterations omitted); *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 720 (1st Cir. 2014) ("while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough—especially if the surrounding circumstances undermine any claim of causation").

At the time Mr. Jenkins sent the letter, the disciplinary process had been underway for three months. Plaintiff was placed on administrative leave on March 17, 2016, pending a disciplinary hearing as a result of his alleged "course of misconduct." He was notified on June 10, 2016, that a hearing was set for June 21, 2016, on the six specific disciplinary charges. Moreover, the record is replete with admonishments and warnings to Mr. Jenkins throughout 2015-16 to cease and desist his wide-ranging, inappropriate, and unprofessional email campaign. He was placed on administrative leave twice between April 2015 and March 2016, and he had received warnings for insubordination and failure to follow the reasonable requests of his supervisor. "Employers need

long history of complaints, and if it had, it would likely have been in retaliation for the early complaints, *id.* at 6-7, and then conversely, "that the Trial Court did terminate him because of the complaints and it was retaliation." *Id.* at 7. While Chief Justice Sullivan knew of Mr. Jenkins' history of complaints, having himself been the recipient of many of plaintiff's emails, there is no evidence to show that Chief Justice Sullivan was aware of the June 17, 2016 letter.

21

not suspend previously planned [actions] upon discovering that a [protected activity] has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001); *Baldwin v. Goddard Riverside Cmty. Ctr.*, 53 F. Supp.3d 655, 674 (S.D.N.Y. 2014 ("since the record establishes that [plaintiff's] supervisors began the process of terminating her employment before she engaged in protected activity, she cannot rely on temporal proximity to satisfy the causal connection element of a prima facie case of Title VII retaliation") (internal citation, quotation marks and alterations omitted), *aff'd*, 615 F. App'x 704 (2d Cir. 2015); *Ianetta v. Putnam Investments, Inc.*, 183 F. Supp.2d 415, 426 (D. Mass. 2002), *amended* (Feb. 25, 2002). Considering all of the facts and circumstances, the larger picture, a causal connection between Mr. Jenkins' protected activity and his termination cannot be inferred from temporal proximity. *Cf. Nassar*, 570 U.S. at 358. That Mr. Jenkins had complained for years about a variety of issues in the Trial Court, including discrimination, and then wrote the June 17, 2016 letter knowing his disciplinary hearing was already scheduled, simply is too little to establish a causal link between his protected conduct and his dismissal.

Because Mr. Jenkins has failed to establish a prima facie case of retaliatory discharge, his Title VII claim should be dismissed. Even if plaintiff had proven his requisite prima facie case, however, his retaliation claim would still fail, as he has produced no evidence to undercut the defendant's legitimate, nondiscriminatory reasons for terminating his employment.

Defendant's reasons for Mr. Jenkins' termination are set forth at length in Mr. Burke's decision following the disciplinary hearing conducted on June 21, 2016. In pertinent part, the report reads as follows:

> In March of 2015, Mr. Jenkins commenced writing numerous, voluminous e-mails alleging perceived improprieties in how the Trial Court conducts his business. He

22

was advised to cease and desist with this activity and acknowledged same in an e-mail dated April 28, 2015. Due to the fact he ignored this order, and the nature of the content of his e-mails, he was originally placed on Administrative Leave on April 29, 2015 pending an independent medical evaluation to determine his fitness for duty, and instructed not to contact any Trial Court staff or enter any courthouse without prior permission. On June 12, 2015, he violated that order by appearing at the Adams Courthouse in what was described as in an agitated state.

On July 1, 2015, a meeting was conducted with Mr. Jenkins, the Union representative and others to prepare him for his return to work and advise him of the expected level of conduct. During that meeting, Mr. Jenkins conducted himself in a very unprofessional and confrontational manner and as such was warned in a letter dated July 2, 2015 from Eamonn Gill, Labor Counsel that such conduct upon his return to work could result in discipline up to and including termination. On July 6, 2016, Mr. Gill notified Mr. Jenkins in writing that the Trial Court will explore all of his claims, give him a response and reinforced his expected level of conduct. On July 14, 2015, Chief Housing Specialist Neville gave Mr. Jenkins a written warning due to his repeated unacceptable behavior. Mr. Jenkins['] unprofessional behavior, continued e-mails, potential abuse of sick leave and failure to work co-operatively with other continued throughout the balance of 2015 and into 2016.

On February 4, 2016, I conducted a Step II Grievance Hearing concerning Mr. Jenkins as a result of an additional written warning dated December 4, 2015 given to him by Mr. Neville. Once again during that hearing, Mr. Jenkins conducted himself in a very confrontational, abusive, unprofessional manner. His grievance was denied.

In March 2016, the HR Department of the Trial Court completed its exploration into all of Mr. Jenkins' alleged complaints. On March 8, 2016 Attorney Rodney-Celestine requested Mr. Jenkins to attend a meeting on March 9 with her and Attorney Day to give him the report they had compiled on his complaints. He refused to attend. On March 10, he was ordered to attend the meeting now scheduled for March 14 at 9:30 AM. In two separate e-mails dated March 11, he once again refused to attend. On March 14 at 7:35 AM, he sent an e-mail indicating for the first time he had a medical appointment that morning and that he would not be present for the meeting. Subsequently, he called Mr. Neville later that morning indicating he had an appointment and would not be reporting for work. After Mr. Neville spoke to Attorney Rodney-Celestine concerning the issue, Mr. Neville was instructed to call Mr. Jenkins and order him to report to work on March 15 for this meeting and that he had failed to follow procedure for requesting time off.

Unfortunately, on March 15, the entire staff of the Housing Court Administrative Office [was] at a Divisional Meeting in Springfield. Therefore when Mr. Jenkins arrived for his meeting, he was alone with Attorneys Rodney-Celestine and Day. They reported that he once again acted confrontational, abusive and threatening to

the point that they were concerned for their safety. As such, when he abruptly left the meeting, indicating he would be right back, they left for their personal protection. Later that morning, he wrote an e-mail to [A]ttorney Rodney-Celestine attempting to explain his actions and in that e-mail he acknowledged he recorded the meeting. In a letter dated March 16, 2016 to Mr. Jenkins from Attorney Rodney-Celestine, she clearly stated, "Your complaint was investigated, findings were issued and the matter is now closed." He was further instructed to cease and desist from all communication with Trial Court employees concerning his claims. As a result of his ongoing misconduct, he was again placed on administrative leave on March 17, 2016 and instructed not to enter any Trial Court Facility or communicate with any Trial Court employee unless directed to do so by me.

On June 10, 2016, at the completion of management's investigation, Mr. Jenkins was notified of the disciplinary hearing scheduled for June 21, 2016 which he acknowledged receiving. He was subsequently sent an electronic copy of all the documents management intended to submit at the hearing and a hard copy was provided on the date of the hearing. At the hearing, Mr. Jenkins at first feigned ignorance as to why the hearing was taking place, then indicated he did not have sufficient time to prepare. He was unwilling at first to go through each of the charges, but wanted to rehash all the issues contained in his complaint. Even though advised that matter is closed, he refuses to accept that and attempts to obfuscate every discussion with those issues. He once again acted in an unprofessional, confrontational and abusive manner and causes representatives of management to be extremely concerned. At one point, I had to advise him that his standing, loud voice and pounding on the table was not helping his cause. He sermonized and made reference to multiple biblical passages and stated it was his responsibility to cut off the head of the snake. Hence the need for two members of the Security Department. It is clear from Mr. Jenkins' own statements, his behavior, management's witnesses and documents that Mr. Jenkins has engaged in all the misconduct as outlined in the June 10, 2016 notice. I find as such.

 (#119 ¶ 54, Exh. 55.) Based on his findings, Mr. Burke concluded that plaintiff should be dismissed from his employment as soon as possible. (#119, Exh. 55 at 4.)

The reasons relied on by Mr. Burke for terminating plaintiff's employment are substantially supported by the undisputed facts. Chief Justice Sullivan accepted Mr. Burke's recommendation and terminated Mr. Jenkins' employment. As defendant has articulated legitimate, nondiscriminatory reasons for dismissing plaintiff, it is incumbent upon Mr. Jenkins to show that the reasons are pretextual and the real reason for his termination was discriminatory retaliation.

24

Case 1:16-cv-11548-PBS Document 127 Filed 12/09/19 Page 25 of 26

Mr. Jenkins argues that the reasons stated by the defendant are false, and that he was dismissed because he complained about discrimination. It is true that the record is filled with emails and letters from plaintiff complaining about numerous problems and injustices, including discrimination, that he perceived in the Trial Court. What plaintiff does not address is why his undeniably insubordinate behavior and refusal to follow directives, or the manner in which he raised his complaints, i.e., via emails as opposed to through appropriate channels, despite having been told to do so on many occasions, are sham reasons. That Mr. Jenkins believed he had the right to ignore instructions or directions from his supervisor or from Human Resources personnel because those individuals were "corrupt" does not mean that his failure to comply was not a legitimate basis for dismissal.

The law is clear: "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.'" *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 52 (1st Cir. 2010) (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir.1991)). Plaintiff points to nothing in the record, no specific facts, upon which a fact finder could reasonably conclude that defendant's reasons for terminating his employment were a "sham" and that the true reason was racially-motivated retaliation. *Walker v. City of Holyoke*, 523 F. Supp.2d 86, 112 (D. Mass. 2007). An argument that "[p]laintiff's evidence of derogatory and unfair treatment explain [sic] that he is justified in making the complaints and should not have been dismissed for doing them" (#123 at 8) is not enough. *See Melendez*, 622 F.3d at 53.

25

Mr. Jenkins has not met his burden on step three of the burden-shifting paradigm. As plaintiff has failed to present sufficient evidence to support a Title VII retaliation claim, summary judgment should enter in defendant's favor.

## V. Recommendation.

For the reasons stated, I RECOMMEND that Defendant Trial Court of the Commonwealth of Massachusetts' Motion for Summary Judgment (#117) be GRANTED.

## VI. Review by the District Judge.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of service of this Report and Recommendation. The objections must specifically identify the portion of the recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Federal Rules Civil Procedure, shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

December 9, 2019

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge

26